UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMM 2014-UBS4 SOUTH 820 EAST, LLC<br><br>Plaintiff,<br><br>-against-<br><br>MARK H. ROBINSON, MICHAEL N. ROBINSON, KEITH W. CASEY and KEVIN L. CASEY,<br><br>Defendants. | Civil Case No.: 1-25-cv-08829<br><br>**COMPLAINT** |

Plaintiff COMM 2014-UBS4 SOUTH 820 EAST, LLC ("*Plaintiff*"), asserts this action against Defendants Mark H. Robinson, Michael N. Robinson, Keith W. Casey, and Kevin L. Casey and, in support thereof, alleges as follows:

## SUMMARY OF COMPLAINT

1. Plaintiff brings this action to recover at least $1,419,654.80 due and owing under a Guaranty of Recourse Obligations dated June 27, 2014 (the "*Guaranty*"), duly executed by Mark H. Robinson, Michael N. Robinson, Keith W. Casey, and Kevin L. Casey (collectively, "*Defendants*"). A true and correct copy of the Guaranty is attached hereto as **Exhibit A.**

## PARTIES

2. Plaintiff is the holder of certain Loan Documents, defined below, that are the subject of this lawsuit.

3. Defendants are the guarantors of certain obligations relating to the Loan Documents, as further defined and described below.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

5. First, as stated in Paragraph 1 and outlined in Paragraphs 66-68 *infra*, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Second, there is complete diversity of citizenship between Plaintiff and Defendants.

7. Plaintiff is a Delaware limited liability company. The citizenship of a limited liability company is determined by the citizenship of all of its members. *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998); *see also Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077 (5th Cir. 2008).

8. Plaintiff has one member. That sole member is Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of COMM 2014-UBS4 Mortgage Trust Commercial Mortgage Pass-Through Certificates (the "*Trust*").

9. The Trust is a "real estate mortgage investment conduit" created solely under the Internal Revenue Code, 26 U.S.C. § 860D, and whose citizenship is determined by the citizenship of its trustee. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465, 468–69 (S.D.N.Y. 2001); *see also Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("A trust has the citizenship of its trustee or trustees.").

10. Wilmington Trust, National Association, ("*Wilmington Trust*"), a national banking association, serves as the trustee of the Trust.

11. Federal courts determine diversity jurisdiction based on the citizenship of the real parties to the controversy. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980); *Wells Fargo Bank, N.A. v. Konover Dev. Corp.*, 630 F. App'x 46, 49 (2d Cir. 2015).

12. A trustee is deemed the real party to the controversy when vested with such customary powers to hold, manage, and dispose of assets for the benefit of others. *Navarro*, *446*

*U.S.* at 464. Here, Wilmington Trust possesses these powers and therefore is the real party in interest for purposes of determining diversity jurisdiction.

13. As a national banking association, Wilmington Trust is a citizen of the state where its main office is located, as designated in its articles of association. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). Wilmington Trust's main office, as set forth in its articles of association, is in Wilmington, Delaware. Wilmington Trust is therefore a citizen of Delaware. Accordingly, Plaintiff is also a citizen of Delaware.

14. Defendants are each individual persons. Upon information and belief, Defendants are individuals and citizens of the State of Utah, are domiciled in Utah, and intend to remain in Utah.

15. Thus, there is complete diversity because Plaintiff is a citizen of Delaware and Defendants are citizens of Utah.

16. Venue is properly vested in this District pursuant to 28 U.S.C. § 1391 because Defendants consented to venue in this Court.

17. Specifically, Section 6.3 of the Guaranty provides, in pertinent part:

> **6.3   Governing Law; Submission to Jurisdiction.**
>
> This Guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America. Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this Guaranty may at Lender's option be instituted in any Federal or State court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

**BACKGROUND FACTS**

**I.       The June 27, 2014 Loan Documents.**

18. On June 27, 2014, UBS Real Estate Securities Inc. ("*Original Lender*") made a loan (the "*Loan*") in the principal amount of $36,500,000.00 to North Pointe Buildings LLC ("*Borrower*").

19. The Loan is evidenced by that certain Promissory Note dated June 27, 2014, made by Borrower to Original Lender in the principal amount of $36,500,000.00 (the "*Note*"). The Note was endorsed by Original Lender to Wilmington Trust, National Association, as Trustee, for the Trust ("*Interim Lender*") and then to Plaintiff pursuant to allonges. A true and correct copy of the Note and the allonges thereto are attached as **Exhibit B**.

20. In connection with the Loan, Borrower and Original Lender entered into that certain Loan Agreement (the "*Loan Agreement*") dated June 27, 2014. The Loan Agreement, among other things, describes the loan transaction and various security interests securing the Loan. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit C**.

21. The Loan Agreement details Borrower's debt payment requirements, including Borrower's obligation to make monthly debt service payments and to pay late charges, interest and default interest where applicable. (Ex. C §§ 2.2 and 2.3.)

22. The Loan Agreement provides, among other things, that an Event of Default occurs if "any monthly Debt Service, any monthly deposit of Reserve Funds or the payment due on the Maturity Date is not paid when due or (B) if any other portion of the Debt is not paid when due; provided that, with respect to this clause (B), such non-payment continues for five (5) days following notice to Borrower that the same is due and payable [.]" (Ex. C § 10.1(a)(i).)

23. Pursuant to Section 1.1 of the Loan Agreement, "Debt" is defined as "the Outstanding Principal Balance, together with all interest accrued and unpaid thereon, and all other

sums due to Lender in respect of the Loan under the Note, this Agreement, or any other Loan Document."

24. In addition to the Loan Agreement, Borrower and Original Lender also executed a Cash Management Agreement dated June 27, 2014 (the "*Cash Management Agreement*"), a true and correct copy of which is attached hereto as **Exhibit D.**

## II.     The Deed of Trust And Assignment Of Rents.

25. The Loan is secured by, among other things, that certain Deed of Trust, Security Agreement and Fixture Filing, dated June 27, 2014 (the "*Deed of Trust*"), a true and correct copy of which is attached hereto as **Exhibit E**. The Deed of Trust was recorded on June 27, 2014, as Instrument Number 44187:2014 in the Utah County Recorder's Office (the "*Official Records*").

26. The Deed of Trust covers certain real and personal property commonly known as "North Pointe Business Park" located at 1261 South 820 East, 825 East 1180 South, and 1220 South 630 East American Fork, Utah 84003 (the "*Property*").

27. The Deed of Trust was assigned by Original Lender to Interim Lender pursuant to that certain Assignment of Deed of Trust, Security Agreement and Fixture Filing recorded on August 13, 2014, as Instrument Number 56489:2014 in the Official Records. A true and correct copy of that first assignment of Deed of Trust is attached hereto as **Exhibit F**. The Deed of Trust was further assigned by Interim Lender to Plaintiff by that certain Assignment of Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents (the "*Assignment of Deed of Trust*") recorded on February 19, 2025, as Instrument Number 11725:2025 in the Official Records. A true and correct copy of the Assignment of Deed of Trust is attached hereto as **Exhibit G.**

28. Borrower also executed that certain Assignment of Leases and Rents dated June 27, 2014 (the "*Assignment of Rents*") to Original Lender, a true and correct copy of which is

5

attached hereto as **Exhibit H**. The Assignment of Rents was assigned by Original Lender to Interim Lender pursuant to that certain Assignment of Assignment of Leases and Rents recorded on August 13, 2014, as Instrument Number 56490:2014 in the Official Records. A true and correct copy of the Assignment of Assignment of Leases and Rents is attached hereto as **Exhibit I.** The Assignment of Rents was further assigned by Interim Lender to Plaintiff by that certain Assignment of Assignment of Leases and Rents (the "*Assignment of Assignment of Rents*") recorded on February 19, 2025, as Instrument Number 11726:2025 in the Official Records. A true and correct copy of the Assignment of Assignment of Rents attached hereto as **Exhibit J.**

29. To further secure the repayment of the Loan, and as an inducement to Original Lender to make the Loan to Borrower, Defendants executed the Guaranty on June 27, 2014.

30. The Note, Loan Agreement, Deed of Trust, Assignment of Rents, Cash Management Agreement, and Guaranty are collectively referred to herein as the "*Loan Documents*."

31. On August 6, 2014, Original Lender assigned all of its right, title and interest in and to the Loan Documents to Interim Lender pursuant to that certain General Assignment and Assumption, a true and correct copy of which is attached hereto as **Exhibit K.** In February 2025, Interim Lender assigned all right, title and interest in the Loan Documents to Plaintiff pursuant to the Omnibus Assignment of Loan Documents, a true and correct copy of which is attached hereto as **Exhibit L**. As a result, Plaintiff is the owner, holder, and beneficiary of the Loan Documents and is the "Lender" as that term is used in the Loan Documents.

32. New York law governs the Loan Documents. (*See* Ex. A § 6.3; Ex. B § 9; Ex. C § 11.3; Ex. D §7.10; Ex. E § 13.1; Ex. H §5.5; Ex. K.)

6

### III. The Relevant Provisions Of The Guaranty.

33. Defendants each "irrevocably and unconditionally guaranteed[d] to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise." (Ex. A § 1.1(a).)

34. The Guaranty defines the "Guaranteed Obligations" to include, among other things, "Borrower's Recourse Liabilities." (Ex. A § 1.1.)

35. Borrower's Recourse Liabilities include:

> [A]ny loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with . . .
>
> (v) the misappropriation, misapplication or conversion by Borrower of . . . any Rents . . .
>
> (xvii) if Borrower, Guarantor or any Affiliate of Borrower or Guarantor contests, impedes, delays or opposes the exercise by Lender of any enforcement actions, remedies or other rights it has under or in connection with this Agreement [the Guaranty] or the other Loan Documents or objects to any notice of strict foreclosure or similar notice; provided that neither Borrower nor Guarantor shall be liable to the extent of any applicable loss, damage, cost, expense, liability or claim or other obligation arising solely from a defense of Borrower, Guarantor or any Affiliate of Borrower of Guarantor raised in good faith [.]

(Ex. C §§ 11.22(v) and 11.22(xvii).)

36. The Guaranty also provides that:

> If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender . . . pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender.

(Ex. A § 1.4.)

7

37. Defendants agreed to numerous other relevant provisions in the Guaranty, including the following:

    a. Defendants agreed that the Guaranty is an "irrevocable, absolute continuing guaranty of payment and performance and not a guaranty of collection" and that they are "liable for the Guaranteed Obligations as a primary obligor." (Ex. A §§ 1.1(a) and 1.2.)

    b. Defendants agreed that it "shall not be necessary for Lender . . . in order to enforce the obligations of" the Guaranty to "institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person . . . join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty. . . exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, . . . [or] resort to any other means of obtaining payment of the Guaranteed Obligations." (Ex. A § 1.5.)

    c. Defendants agreed that "Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations." *Id*.

    d. Defendants agreed that if they breach or fail "to timely perform any provisions" of the Guaranty "upon demand by Lender," they are immediately liable for "all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder, together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender." (Ex. A § 1.7.)

    e. Defendants agreed that their obligations "shall not be released, diminished, impaired, reduced or adversely affected" by, among other things, (i) the "invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations"; (ii) Borrower's "valid defenses, claims or offsets . . . which render the Guaranteed Obligations wholly or partially uncollectible from Borrower"; or (iii) any "existing or future right of offset, claim or defense of Borrower or Guarantor against Lender, or any other party, or against payment of the Guaranteed Obligations . . ." (Ex. A §§ 2.4, 2.4(v), and 2.10.)

## IV.    **The Relevant Loan Document Provisions Addressing Rents.**

38. Borrower previously leased a substantial portion of the Property to Fidelity Real Estate Company, Inc. ("*Fidelity*") pursuant to a Lease Agreement, dated October 24, 2007, as amended thereafter (the "*Fidelity Lease*").

39. The Loan Agreement addresses how Borrower agreed to handle rents generated by the Property, including rents payable under the Fidelity Lease (the "*Rents*").

40. Specifically, the Loan Agreement requires Borrower to establish and maintain a "Clearing Account" with a designated "Clearing Bank," in trust for the benefit of Plaintiff and under Plaintiff's sole dominion and control (the "*Clearing Account*"). (Ex. C § 2.7.1.)

41. The Loan Agreement provides that funds in the Clearing Account are to be swept into a "Cash Management Account" once every business day throughout the term of the Loan. (Ex. C § 2.7.1(c).) Section 2.7.2 of the Loan Agreement then establishes a waterfall which governs how funds in the Cash Management Account are applied.

42. The waterfall changes when a "Cash Sweep Event Period" occurs.

43. A "Cash Sweep Event Period" is defined to include any period "commencing on the occurrence of a Cash Sweep Event and continuing until the earlier of (i) the Monthly Payment Date[1] following the occurrence of the applicable Cash Sweep Event Cure or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents in accordance with the terms and provisions of the Loan Documents." (Ex. C §1.1 at 6.)

44. A "Cash Sweep Event" is defined to include, among other things, the occurrence of a Major Tenant Trigger Event. (Ex. C § 1.1 at 5.)

45. A "Major Tenant Trigger Event" is defined to include, among other things, the occurrence of:

> (C) any Major Tenant . . . (2) failing to extend or renew its Lease upon terms and conditions reasonably acceptable to Lender on or before the earlier of (1) the date twelve (12) months prior to the then applicable expiration date

---

[1] The Loan Agreement defines the "Monthly Payment Date" as "the sixth (6th) day of every calendar month occurring during the [Loan] Term" beginning on August 6, 2014. (Ex. C. § 1.1 at 20.)

9

        under said Lease, and (2) the date upon which such notice is due under the then-applicable terms of such Lease; . . .

(Ex. C § 1.1 at 17.)

    46.    Under Section 2.7.2(b)(xi) of the Loan Agreement, during a "Cash Sweep Event Period," the funds remaining in the Cash Management Account (the "*Excess Cash Flow*")[2] must be deposited into an "Excess Cash Flow Account"[3] and held and applied in accordance with Sections 6.10 and 6.11 of the Loan Agreement provided that, if the Cash Sweep Event was triggered by a "Major Tenant Trigger Event," and no "Major Tenant Cure" has occurred, such Excess Cash Flow must instead be deposited into the Major Tenant Rollover Reserve.

    47.    Section 6.10.1 of the Loan Agreement also provides that "[d]uring a Cash Sweep Event Period, Borrower shall deposit with Lender all Excess Cash Flow (other than Major Tenant Rollover Funds deposited in the Rollover Account pursuant to Section 6.6.1 above), which sums shall be held by Lender as additional security for the Loan."

    48.    Under Section 6.6.1(a) of the Loan Agreement, "[d]uring any period after the occurrence of a Major Tenant Trigger Event and prior to the occurrence of an applicable Major Tenant Cure with respect thereto, Borrower shall, on each Monthly Payment Date, deposit with Lender an additional amount equal to all Excess Cash Flow pursuant to the proviso at Section 2.7.2(b)(xi) above, to be held for tenant improvements and leasing commissions that may be incurred in relation to said Major Tenant Trigger Event."

    49.    In short, and under at least the above provisions, Plaintiff (not Borrower) was entitled to hold any Excess Cash Flow following and during a Cash Sweep Event Period.

---

[2] "Excess Cash Flow" are the funds remaining after payment of the various expenses identified in the Loan Agreement's waterfall provision. (Ex. C §2.7.2(xi).)

[3] Capitalized terms not defined herein have the meanings ascribed to them in the Loan Documents.

## V. The Major Tenant Trigger Event Entitling Plaintiff To Excess Cash Flow.

50. The Fidelity Lease included three extension options (each, an "*Extension Option*"). Fidelity exercised the first two Extension Options, extending the Fidelity Lease term through April 30, 2024. Fidelity had the right to exercise a third Extension Option for one additional five-year term, from May 1, 2024, through April 30, 2029.

51. To exercise the third Extension Option, Fidelity had to provide written notice to Borrower no later than July 31, 2023.

52. Fidelity did not renew the Fidelity Lease to extend beyond April 30, 2024. Under the Loan Agreement, Fidelity is defined as a "Major Tenant." As a result, Fidelity's failure to renew the Fidelity Lease constituted a "Major Tenant Trigger Event" and a "Cash Sweep Event" as of April 30, 2023, which was the earlier of: (1) twelve (12) months prior to the then-current expiration date of the Fidelity Lease (April 30, 2023), and (2) the deadline for Fidelity to provide notice of an extension under the Fidelity Lease (July 31, 2023).

53. Midland Loan Services ("*Midland*"), the Loan's Master Servicer, therefore provided notice that, due to Fidelity's failure to renew the Fidelity Lease, a Major Tenant Trigger Event occurred. Midland also confirmed that all Excess Cash Flow accruing thereafter was due and owing to Lender to deposit into the "Rollover Reserve" (the "*Major Tenant Trigger Event Notice*"). A true and correct copy of the Major Tenant Trigger Event Notice is attached hereto as **Exhibit M**.

54. Based on figures currently available to Plaintiff, Plaintiff estimates that at least $1,269,654.80 in Excess Cash Flow accrued after April 30, 2023. But Borrower, not Plaintiff, retained that Excess Cash Flow notwithstanding Plaintiff's entitlement to it.

55. Borrower's retention of Excess Cash Flow during a continuing Cash Sweep Event Period therefore constitutes "misappropriation, misapplication or conversion by Borrower of . . . any Rents." That misappropriation, misapplication, and/or conversion also constitutes a Borrower's Recourse Liability under the Loan Agreement, thereby triggering Defendants' liability under the Guaranty.

### VI. Borrower Contested, Impeded, Delayed, And/Or Opposed An Enforcement Action.

56. In addition to the misappropriation, misapplication, and/or conversion described above, Borrower defaulted under the Loan by, among other things, failing to make required payments when due. (Ex. C § 10.1(a).)

57. Interim Lender therefore demanded payment of amounts owed by Borrower, but Borrower failed to remit the required payments. On June 24, 2024, Interim Lender sent Borrower written notice of Borrower's non-payment default (the "*Notice of Default*"). A true and correct copy of the Notice of Default is attached hereto as **Exhibit N.**

58. Based upon the foregoing, in 2024, Interim Lender filed a lawsuit against Borrower in the Fourth Judicial District Court of Utah County, Utah (the "*Utah Court*"), captioned *Wilmington Trust, National Association, as Trustee, for the Benefit of Holders of COMM 2014-UBS4 Mortgage Trust Commercial Mortgage Pass-Through Certificates v. North Pointe Buildings LLC* (Civil Action No. 240406235) (the *"Enforcement Action"*). A true and correct copy of Interim Lender's Verified Complaint in the Enforcement Action (without exhibits) is attached hereto as **Exhibit O.**

59. Among other things, Interim Lender's Verified Complaint sought the appointment of a receiver to manage the Property given Borrower's monetary Event of Default.

60. Interim Lender also filed a Motion to Appoint Receiver.

12

61. Notwithstanding the Borrower Recourse Liability provisions of the Loan Agreement, Borrower repeatedly contested, impeded, delayed and/or opposed the Enforcement Action, including by: (i) filing a motion to dismiss the Enforcement Action; (ii) raising numerous defenses as well as counterclaims in opposition to the Enforcement Action; (iii) seeking an order temporarily and permanently enjoining Lender from non-judicially foreclosing on the Property; and (iv) delaying the Enforcement Action by moving to transfer venue.

62. The lengthy list of Borrower's filings contesting, impeding, delaying, and/or opposing the Enforcement Action include at least the following:

   a. Motion to Dismiss, dated December 17, 2024;

   b. Memorandum Opposing Plaintiff's Motion to Appoint Receiver, dated December 17, 2024;

   c. Reply Memorandum in Support of Motion to Dismiss, dated January 7, 2025;

   d. Borrower's Answer and Counterclaim, dated May 19, 2025, wherein Borrower asserted twelve (12) defenses and multiple counterclaims;

   e. Borrower's Motion for Injunctive Relief seeking to enjoin Interim Lender from temporarily and permanently foreclosing on the Property, dated May 30, 2025;

   f. Borrower's Motion to Transfer Venue to the Business and Chancery Court, dated June 2, 2025[4];

   g. Borrower's *Ex Parte* Motion for a Temporary Restraining Order seeking to enjoin Interim Lender from non-judicially foreclosing on the Property, dated June 25, 2025;

---

[4] The Utah Court entered an Order Denying Defendant's Motion to Transfer Venue to Business and Chancery Court with Prejudice and Denying Defendant's Motion for Injunctive Relief with Prejudice on September 29, 2025.

    h. Borrower's Reply Memorandum in Support of its Motion to Transfer Venue to the Business and Chancery Court, dated July 1, 2025;

    i. Reply Memorandum in Support of Borrower's Motion for Injunctive Relief, dated July 1, 2025; and

    j. Borrower's Notice of Supplemental Authority in Support of its Motion to Transfer Venue to the Business and Chancery Court, dated July 7, 2025.

63. Notwithstanding Borrower's numerous filings in the Enforcement Action, the Utah Court rejected Borrower's attempts to prevent Interim Lender from enforcing its rights under the Loan Documents, and Interim Lender therefore foreclosed on the Property on July 28, 2025.

64. Nonetheless, Borrower's extensive efforts to contest, impede, delay, and/or oppose the Enforcement Action triggered Borrower's Recourse Liabilities (and, in turn, Defendants' liability under the Guaranty) for the "loss, damage, cost, expense, liability, claim or other obligation incurred by [Plaintiff] (including attorneys' fees and costs reasonably incurred) arising out of or in connection with" Borrower contesting, impeding, delaying and opposing the Enforcement Action. (Ex. C §§ 11.22(v) and 11.22(xvii); Ex. A § 11.2(xvii).)

65. Plaintiff currently estimates that it incurred over $150,000.00 in attorneys' fees and costs defending against Borrower's failed efforts to contest, impede, delay, and/or oppose the Enforcement Action.

### VII. Defendants Are Irrevocably And Unconditionally Liable To Repay The Borrower Recourse Liabilities.

66. On October 22, 2025, Plaintiff sent written notice to Borrower and Defendants of the foregoing Borrower's Recourse Liabilities and demanded the immediate payment of the Guaranteed Obligations in the amount of $1,419,654.80. A true and correct copy of the October 22, 2025 letter is attached hereto as **Exhibit P**.

67. As of the date of this filing, neither Borrower nor Defendants have repaid the due and owing Guaranteed Obligations.

68. Plaintiff has incurred, and will continue to incur, attorneys' fees, costs, and other expenses in connection with the enforcement of the Guaranty as well as the preservation of Plaintiff's rights thereunder.

## COUNT I

### Breach of Guaranty

69. Plaintiff repleads, realleges, and incorporates herein by reference Paragraphs 1 through 68 as if fully set forth herein.

70. The Guaranty is a valid and enforceable agreement.

71. Plaintiff or its predecessors performed all actions required of them in connection with the Guaranty.

72. Defendants each "irrevocably and unconditionally guaranteed[d] to Lender . . . the payment and performance of the Guaranteed Obligations," including the payment of Borrower's Recourse Liabilities. (Ex. A § 1.1.)

73. Borrower's misappropriation of the Excess Cash Flow constitutes a Borrower's Recourse Liability and a Guaranteed Obligation under the Guaranty.

74. Similarly, Borrower's interference with the Enforcement Action as described herein constitutes a Borrower's Recourse Liability and a Guaranteed Obligation under the Guaranty.

75. There are no conditions to Defendants' payment obligations other than those that already occurred, as detailed herein.

76. Defendants failed to perform their obligations under the Guaranty.

77. Defendants are jointly and severally liable for their breaches of the Guaranty.

78. Defendants owe at least $1,419,654.80, and Defendants' breach of the Guaranty has therefore caused Plaintiff to suffer damages in the amount of at least $1,419,654.80.

79. Plaintiff is entitled to its costs and attorneys' fees incurred in connection with the enforcement of the Guaranty.

**WHEREFORE**, Plaintiff therefore respectfully requests that the Court enter an order awarding Plaintiff:

1. The full amount of the Guaranteed Obligations, plus such other amounts that will continue to accrue through the entry of judgment in this case;

2. Plaintiff's reasonable attorneys' fees, costs, and expenses;

3. Plaintiff's costs of suit; and

4. Such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 24, 2025

Respectfully submitted,

*/s/ Elinor H. Murarova*
Elinor H. Murarova (SDNY Bar No. 5459441)
**DUANE MORRIS LLP**
190 South LaSalle Street, Suite 3700
Chicago, IL 60603-3433
Phone: 312.499.6734
Fax: 312.277.2389
ehart@duanemorris.com

*Counsel for Plaintiff*